<table>
<tr><td>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O.  Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
Warren J. Martin, Jr., Esq. (wjmartin@pbnlaw.com)
Rachel A. Parisi, Esq. (raparisi@pbnlaw.com)
Christopher P. Mazza, Esq. (cpmazza@pbnlaw.com)

*Proposed Counsel to Debtor and Debtor-In-Possession*

</td></tr>
</table>

| In re:<br><br>FLAGSHIP RESORT DEVELOPMENT CORPORATION,[1]<br><br>Debtor. | Chapter: 11<br><br>Case No.: 25-15047 (JNP) |
|---|---|

### DECLARATION OF CHERIE PARKS, CHIEF FINANCIAL OFFICER OF THE DEBTOR, IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Cherie Parks, make this declaration (the "Declaration") pursuant to 28 U.S.C. § 1746:

1.     I am the Chief Financial Officer ("CFO") of the Debtor, Flagship Resort Development Corporation (the "Debtor"), having served as CFO for the Debtor since February 3, 2023.  Prior thereto, from 2007 through 2023, I served alternately as the Controller/Vice President of Finance for the King's Creek by Spinnaker Resorts timeshare of 272 units and 14,000 intervals located in Williamsburg, Virginia.  I have a Bachelor's Degree in Applied Science, Accounting and Finance from the University of Phoenix in 2007.  Altogether, I have approximately 25 years of experience in the timeshare industry, all in the accounting or financial oversight and advisory function.

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number is: Flagship Resort Development Corporation, a New Jersey corporation (1067). The location of the Debtor's service address is: 60 North Maine Avenue, Atlantic City, NJ 08401.

8085755

2.      I am familiar with the Debtor's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of the Debtor's above-captioned chapter 11 case (the "Chapter 11 Case").  I make this declaration in support of the Debtor's First Day Motions (as defined herein).

3.      On May 10, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Court").  The Debtor continues to operate its business and manage its assets as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      To enable the Debtor to operate effectively and to minimize any potential adverse effects in this Chapter 11 Case, the Debtor has requested certain relief in "first day" motions and applications (collectively, the "First Day Motions") filed with the Court concurrently herewith.  The First Day Motions, summarized below, seek, among other things, to: (a) ensure the continuation of the Debtor's cash management system and other business operations without interruption, (b) allow the Debtor to continue using cash collateral and the proceeds of three debtor-in-possession financing facilities ("DIP Financing"), (c) preserve the Debtor's valuable relationships with vendors, unit owners, customers, and other interested parties, (d) preserve the Debtor's ability to continue to sell its timeshare inventory in the ordinary course of its business, (e) maintain employee morale and confidence, and (f) implement certain administrative procedures that will promote a seamless transition into Chapter 11.  This relief is critical to the Debtor's efforts to maximize value for the benefit of creditors and all other stakeholders.

5.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by

8085755

the Debtor's employees or professionals, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and the timeshare industry.  I am authorized to submit this Declaration on the Debtor's behalf.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.     Part I of this Declaration provides an overview of the Debtor's history and its business.  Part II describes the Debtor's capital structure.  Part III describes the Debtor's more recent financial history and performance and the events leading to the filing of this Chapter 11 Case.  Part IV addresses the First Day Motions and provides the relevant facts in support of the First Day Motions.

I.     **BACKGROUND OF FLAGSHIP AND ITS BUSINESS**

7.     The Debtor was incorporated on December 30, 1996.  It is a privately held hospitality and resort development company headquartered in New Jersey, with a particular focus on timeshare vacation ownership opportunities in the Atlantic City region.

8.     FantaSea Resorts Group, Inc. ("FRG"), established in 1993, is a holding company and the Debtor's non-Debtor parent.  The Debtor is a wholly owned subsidiary of FRG.  The Debtor's first, or "flagship" property, Flagship All-Suites Resort, was launched in 1996 and quickly became one of the most prominent vacation ownership destinations in Atlantic City, offering more than 300 suites overlooking the Atlantic Ocean.

9.     Building on the success of that property, the Debtor later expanded its resort holdings to include the (i) Atlantic Palace Suites; and (ii) La Sammana Resort.  Through its expanded portfolio, which is currently comprised of a total of 774 living units across the three properties, the Debtor developed a multi-tiered ownership platform encompassing deeded timeshare interests, club memberships, and exchange-based travel benefits.  The 774 living units

3

translate into some 37,000+ timeshare interval units either sold to deeded owners, or unsold, and spread among the three properties the Debtor owns and operates today, as follows:

      i.    <u>The Flagship Resort</u>: The Flagship Resort is located at 60 North Maine Avenue in Atlantic City, and is a 32-story tower housing over 440 units. The resort features amenities such as an indoor swimming pool, fitness center, arcade, and Kelsey & Kim's Oceanview restaurant, where floor-to-ceiling windows provide a direct view of the Absecon Inlet and Brigantine Beach.

      ii.    <u>The Atlantic Palace</u>: The Atlantic Palace is located at 1507 Boardwalk in Atlantic City, and is a 31-story resort with approximately 292 suites. The property offers an outdoor pool, fitness center, and game room, and is conveniently located on the Atlantic City Boardwalk, near various entertainment venues.

      iii.    <u>La Sammana Resort</u>: La Sammana Resort is located at 1400 West Brigantine Avenue in Brigantine, New Jersey, and is a 5-story boutique-style resort comprising 62 units. The resort features a rooftop pool, fitness center, and media room.

10.    The Debtor currently has 101 employees. It's 37,000 timeshare interval inventory is comprised of approximately 33,000 sold and deeded timeshare units owned by individuals and families and spread among the three properties, plus more than 4,000 timeshare intervals currently available for sale.

11.    Over the past three decades, the Debtor has sold tens of thousands of timeshare intervals and managed certain hospitality operations for each property, including the reservation systems, sales and marketing, and in-house financing. The Debtor also offers access to external vacation exchange networks to enhance owner flexibility.

**A.    Anatomy of a Timeshare Transaction**

12.    The Debtor sells approximately 50 timeshare units per week, during the high season, and 1,800 to 2,000 per year, on average, to buyers who, upon closing, become the deeded owners of the units, obtain fee simple ownership, and have their respective deeds recorded with the Atlantic County Clerk. There are studio apartments, one-bedroom units, and two-bedroom units available for sale. Notably, approximately 40% of the Debtor's annual sales are to current timeshare interval owners who are upgrading to a "better" timeshare (*e.g.,* moving from an off-

season interval week to a peak season interval week, or from a smaller unit to a larger unit, such

as from a studio to a one bedroom, or from a one bedroom to a two bedroom).  Our "repeat buyer"

statistic is strong evidence of our owners' satisfaction in the Debtor as well as in the management

of the properties, which is performed by separate management companies under contracts with

properties' Condominium Owners' Associations ("COA"), and Interval Owners Association

("IOA").[2]

13.    In a typical timeshare transaction, a prospective purchaser has stayed in one of the

Debtor's facilities for some period of time, enjoyed the amenities, or in some cases has taken a

tour, and decides, following review of the pertinent Public Offering Statements ("POS")[3] to

purchase a deeded timeshare interval.  A one-week interval will typically sell for $12,000 to

$15,000, depending on the interval at issue and the size of the unit.  The purchaser will put up 10%

to 15% of the purchase price as a down payment, and if the purchaser meets one of the Debtor's

two lenders' top credit score requirements, the Debtor will:  (i) provide a purchase money mortgage

to the purchaser; (ii) hypothecate that mortgage to one of the lenders, and (iii) the applicable lender

will advance 80% to 85% of the mortgage note amount to the Debtor.  For those prospective

purchasers who are in a middle tier of the lenders' credit score requirements, the lenders will

advance 50% of the purchase money mortgage and note amount to the Debtor.  Finally, for a

prospective purchaser whose credit score will not qualify for a 50% collateral assignment of the

Debtor's paper, the Debtor will make its own decision on whether or not to "self-finance" such

buyer.  In that case, each lender has a program whereby, if such purchaser makes six consecutive

---

[2] The four Ownership Associations and the Management Companies and their inter-relationships are described below at ¶¶ 18-21.

[3] There are separate POSs registered with the State and approved by the New Jersey Real Estate Commission for each of the three resorts.

and timely mortgage payments to the Debtor following the purchase, the lender will finance that commercial paper, also at the 50% rate.

14.     Again, at closing, the notes and mortgages from the respective interval purchasers are hypothecated, but not sold outright, to the lender as collateral for the loans.  As a result of this structure, the risk of default by the purchasers is on the Debtor.  If there is a default, the Debtor must still pay the lender the full balance owed to the lender on account of that owner's unit, and then address how to recover from the interval unit owner itself.

### B.    Historical Governance, Organization and Operational Structures

15.     Annexed hereto as **Exhibit A** is a corporate "related entity" organizational structure chart showing the Debtor, its non-debtor parent, FRG, as well as its non-debtor subsidiary, Dream Smart Corp.  The Debtor's non-debtor subsidiary, Dream Smart Corp., is an inactive entity.

#### 1.  The ESOP Purchase[4]

16.     Pursuant to a Stock Purchase Plan entered into on December 9, 2011, Fantasea Resort Group's Employee Stock Ownership Plan (the "ESOP Trust") purchased an 80% interest in the Debtor's parent, FRG, for the sum of $29 million (the "ESOP Transaction"), with the purchase price paid through a Seller Loan and Pledge Agreement embodied in several 30-year promissory notes running from the ESOP Trust as Buyer and various individuals and trusts as sellers (the "Sellers").  As I understand is typical in an ESOP transaction, those notes were cancelled and replaced with: (i) a $29 million note running from the ESOP Trust to FRG, and (ii) various notes running from FRG to the Sellers.

---

[4] The following Part I.B.1. of this First Day Declaration is made upon information and belief, based upon the records of the Debtor, conversations with employees and the ESOP Trustee, and counsel.  To the extent new facts come to light and amendment of this declaration is necessary, I will do so.

8085755

17.     As of the current date, FRG remains indebted to the Sellers in the amount of approximately $1.4 million, and the ESOP Trust remains indebted to FRG in the amount of approximately $21 million.

2.  The Ownership Associations and the Boardwalk Management Entities

18.     Annexed hereto as **Exhibit B** is an "unrelated entity" organizational chart showing the various unaffiliated non-Debtor entities that are involved in the management of the three properties.  There are four total COA or IOA, specifically: (i) Flagship Condominium Association, (ii) La Sammana Condominium Owners' Association, (iii) Royal Suites Interval Association Inc., and (iv) the Atlantic Palace Condominium Association, Inc. (collectively, the "Ownership Associations").  The Ownership Associations are not related to the Debtor or under common ownership with the Debtor, but rather, are membership organizations made up of individual interval and condominium owners with elected boards who run the associations.  Pursuant to Promissory Notes executed on September 11, 2024, made in settlement of unpaid charges owed by the Debtor to the Ownership Associations, the Debtor is indebted to the Ownership Associations in the aggregate amount of approximately $8,301,000 as follows:

a)  Flagship Condominium Owners Association - $2,581,000
b)  La Sammana Condominium Owners Association - $1,468,000
c)  Royal Suites Interval Owners Associations - $4,252,000

19.     In order to deliver the services they need to unit and interval owners, the Ownership Associations contract with third party management companies for services such as maintenance, repair, housekeeping and related services.  These non-debtor management companies, which are not under common ownership with the Debtor, are: (i) First Resorts Management Company, (ii) Fantasea Resorts Management Co., Inc., (iii) and BKRP, LLC (the "Subsidiary Management

Companies"). [5] Each of these Subsidiary Management Companies is a subsidiary of non-debtor Boardwalk Management, LLC ("Boardwalk" and, collectively with the Subsidiary Management Companies, the "Management Companies") which is owned 50% by Roxanne Passarella and 50% by Kevin Jones.  The Debtor and the Management Companies are not under common ownership, either directly or indirectly, insofar as the Debtor is owned by the ESOP Trust.  Exhibit B also reflects each of the non-debtor management companies.

20.    Prior to the ESOP Transaction in 2011, the Management Companies and the Debtor were affiliated entities.  However, in connection with the ESOP Transaction, the affiliated ownership structure was severed: the Debtor thereafter being owned by the ESOP Trust, and the Management Companies remaining owned by the 2011 Sellers.  Thus, services are delivered to unit owners and prospective unit owners through symbiotically operating entities: (i) the Debtor, on the one hand, owned indirectly by the ESOP, and engaged in the business of owning unsold units, as well as marketing, advertising, reservations, and selling units, and (ii) the Management Companies owned indirectly by Kevin Jones and Roxanne Passarella, and engaged in the business of repair, maintenance, housekeeping, and various other administrative functions for the Ownership Associations pursuant to contractual arrangements with the Ownership Associations. In addition to the Debtor's 101 employees, when the Management Companies are also considered, a total of approximately 250 workers make their living in and around the Debtor's three properties, working for either the Debtor or for one of the Management Companies.

21.    In early 2019, the Management Companies were acquired by Kevin Jones and Roxanne Passarella for the sum of $13.5 million, with a significant portion of the purchase price to be paid pursuant to an installment note or notes to the Sellers and with Roxanne and Kevin

---

[5] Boardwalk also has a title company subsidiary, Marina Title Corp., which offers title insurance coverage to prospective deeded interval purchasers.

8085755

personally responsible for the payments. Since 2019, Roxanne and Kevin have been making monthly installment payments of $161,000.

    3.   <u>Governance</u>

22.    The proposed sale described in Part III, hereof, envisions a company formed by Roxanne Passarella and Kevin Jones serving as the stalking horse bidder. Prior to Roxanne and Kevin agreeing to this, another company had expressed interest in serving as the Stalking Horse bidder and also, in a parallel out of court transaction, in purchasing the Management Companies, which are owned, indirectly, by Kevin and Roxanne. Therefore, Kevin and Roxanne are currently: (i) the indirect owners of the Management Companies, (ii) the direct owners of the proposed Stalking Horse bidder, AC Boardwalk Investments, LLC, and (iii) to the extent that the Stalking Horse bidder is outbid, potential parallel sellers of the Management Companies to the winning bidder simultaneously with the sale of the Debtor's assets. As a result of the foregoing, prior to the Petition Date, and specifically, on April 25, 2025, both Kevin and Roxanne resigned from the Debtor's Board of Directors. Further, a two-person restructuring committee of the Board was formed (the "<u>Restructuring Committee</u>") to oversee and direct all matters pertaining to the bankruptcy. The Restructuring Committee is Chaired by independent Board member Jim Casey, who is also the Board Chair, and the second member of the Restructuring Committee is Jay Korn, a long-time employee of the Debtor and a participant of the ESOP, and as such, is an indirect owner of the Debtor through his stock account in the ESOP.

23.    On May 3, 2025, the ESOP Trustee undertook certain efforts to replace FRG's Board of Directors, terminate the members of the Board of Directors of FRG as well as the Debtor's Board of Directors, and to appoint new Board Members to both parent and subsidiary selected by him. Instructions were also provided by the ESOP Trustee's representatives that the

8085755

planned chapter 11 case should not be filed.  Negotiations ensued over the next several days, culminating in a Settlement Term Sheet Agreement which: (i) reinstated the Debtor's current board as it existed on May 2, 2025, (ii) provided for the engagement of Edward Phillips, of Getzler Hennrich, or another individual selected by the ESOP Trustee, as "Conflicts" CRO or "CCRO," to have certain limited authority to evaluate past, present, and future transactions proposed between the Debtor and any current or former insider, (iii) provided for the CCRO to also be appointed as the sole board member of FRG; and (iv) provided a limited release to the ESOP Trustee related to the actions he commenced on May 3, 2025, subject to Challenge during the Challenge Period (each as defined in the DIP Motion (as defined herein)).  A copy of the Settlement Term Sheet is annexed hereto as **Exhibit C**.

## II.    CAPITAL STRUCTURE

24.    Pursuant to a Second Consolidated, Amended and Restated Loan and Security Agreement by and between Flagship as borrower, and FRG, as guarantor, and Banc of California (f/k/a/ Pacific Western Bank, the successor-by-merger to CapitalSource Bank), as administrative, payment and collateral agent for itself, as a Lender and for the other Lenders, dated effective as of December 17, 2019, and as amended through ten (10) amendments, the most recent of which is denominated the "Waiver and Tenth Amendment To Second Consolidated, Amended and Restated Loan and Security Agreement" dated effective as of January 24, 2025, and as further modified via that certain (i) Consent to Second Consolidated, Amended and Restated Loan and Security Agreement dated as of March 31, 2025 ("Consent Agreement 1"); (ii) Consent to Second Consolidated, Amended and Restated Loan and Security Agreement dated as of April 17, 2025 ("Consent Agreement 2"); (iii) Eleventh Amendment and Consent to Second Consolidated, Amended and Restated Loan and Security Agreement dated as of April 25, 2025 ("Consent

8085755

Agreement 3"); and (iv) Consent to Second Consolidated, Amended and Restated Loan and Security Agreement dated as of May 1, 2025 ("Consent Agreement 4" and, together with Consent Agreement 1, Consent Agreement 2, and Consent Agreement 3, the "Consent Agreements"), Flagship is indebted to Banc of California ("BOC"), as of the Petition Date, in an amount not less than $25,402,724.28 (the "BOC Loan").

25.      The BOC Loan is secured by the Debtor's collateral pledge of certain individual notes and mortgages to BOC, as well as, by certain "Specified Low FICO Receivables," "Designated Ineligible Receivables" and certain "Designated Real Property" as more fully described in the BOC Loan Agreement and the Consent Agreements.  It should be noted that the Consent Agreements were entered into in connection with over advances and/or protective advances made to support the Debtor's operations during the five (5) weeks preceding the Petition Date, which provided additional time for the Debtor to responsibly prepare the orderly filing of the Chapter 11 Case.

26.      Pursuant to a Revolving Loan and Security Agreement dated May 12, 2012, by and between Flagship, as borrower, FRG, as guarantor, and Colebrook Financial Company, LLC ("Colebrook" and, together with BOC, the "Receivables Lenders") as amended on various dates to expand the facility and extend the maturity date, the most recent of which is that certain Seventh Amended and Restated Revolving Loan and Security Agreement dated August 22, 2023, as further amended on January 14, 2025 and April 30, 2025, Flagship is indebted to Colebrook, as of the Petition Date, in an amount not less than $15,122,233.99 (the "Colebrook Loan").  The Debtor acknowledges and agrees that the unpaid principal balance of the Loan, evidenced by the Agreement as of July 20, 2022, is in the amount of $14,603,807.57.

8085755

27.     The Colebrook Loan is secured by the Debtor's collateral pledge of Qualified Notes and Qualified Mortgages[6] under the Colebrook Loan Agreement, and bears interest at the greater of 2.5% over prime, or 6.5% per annum if the outstanding balance is under $10,000,0000, but pertinent to the current balance of $15.1 million, bears interest at the greater of 1.5% over prime or 5.5% per annum.

### III.    HISTORY OF THE FINANCIAL DISTRESS, NEED FOR REORGANIZATION, AND THE PROPOSED COURSE OF THIS CHAPTER 11 CASE

#### A.    Cash Flow Pressures

28.     The Debtor, for an extended number of years, has lacked sufficient cash flow to fully fund all dues and charges of the Ownership Associations.   As a result, the Debtor has accrued a substantial arrearage to the Ownership Associations for maintenance fees and similar expenses. On September 11, 2024, as described in paragraph 18, above, those obligations were embodied in three (3) promissory notes, in the aggregate amount of $8,301,000.

29.     The Debtor's primary historical source of revenue is arbitrage, *i.e.*, the difference in the interest rate it receives from interval purchasers vs. the interest rate it pays to its Receivables Lenders.

30.     In recent years, three factors have limited the Debtor's margins.  First, the COVID-19 pandemic and rising interest rates put financial pressures on consumers who might be otherwise be interested in acquiring a timeshare, or who might already own one of the Debtor's timeshares. When families have to cut budgets, entertainment and vacations are often the first to go.  Consumer interest in acquiring timeshares therefore dropped.  As a result, and in order to attract purchasers, the Debtor was forced to reduce the interest rates on earned on its own paper.

---

[6] The collateral securing the BOC Loan is separate from that securing the Colebrook Loan.

31.    Second, bank interest rates have risen.  And rising interest rates on the "payor" side coupled with shrinking interest rates on the "payee" side created a whipsaw effect on the Debtors, shrinking the Debtor's arbitrage margin.

32.    Third, and again, in large part due to economic pressures on consumers, timeshare defaults increased fairly dramatically nationwide, and for the Debtor's mortgagors, approached 40%.   Given these facts alone, Flagship was in need of a financial restructure, even without considering the Debtor's litigation stress, as described in the following subsection III.B.

**B.    The *Palmer* and *Castellano* Litigations, and the Class Action that Followed**

33.    On September 21, 2018, 19 Plaintiffs brought an action against the Debtor, captioned, *Keona Palmer, et al, vs. Flagship Resort Development Corporation,* Docket No. ATL-1515-19, alleging that the Debtor engaged in deceptive sales practices in violation of the New Jersey Real Estate Timeshare Act ("RETA") and the violation of the New Jersey Consumer Fraud Act ("CFA") N.J.S.A. 56:8-1.  The allegedly deceptive activities referenced in the complaint occurred in and prior to 2017, *i.e.*, prior to the time that Kevin Jones and Roxanne Passarella purchased the Management Companies and became Co-CEOs of the Debtor in 2019.

34.    After an eighteen-day trial, the jury awarded the *Palmer* plaintiffs approximately $214,000 in damages for violation of the CFA and the same amount for RETA violations.  The court also granted plaintiffs' motion for counsel fees and costs, ultimately awarding $996,013.  On May 19, 2023, the Superior Court of New Jersey entered a final Judgment against the Debtor in the amount of $1,668,423.88.  On July 26, 2023, the Debtor posted a cash deposit of $1,775,000.00 in lieu of a supersedeas bond, covering both prejudgment and post-judgment interest, thereby staying any collection activities.

35.     The Debtor appealed to the New Jersey Superior Court (Appellate Division), which appeal was docketed therein under Docket No. A-003287-22.  On April 14, 2025, the Appellate Division issued a decision affirming the decision of the Trial Court.

36.     On May 1, 2025, the Debtor docketed its Notice of Petition for Certification to the Supreme Court of New Jersey.  A Supreme Court docket number has not yet been assigned.

37.     On February 28, 2023, the same attorneys who had prosecuted the *Palmer* litigation, acting on behalf of twelve (12) separate plaintiffs, filed a second complaint against Flagship in the Superior Court of New Jersey, Atlantic County, docketed therein as *Castellanos et al v Flagship*, Docket No. ATL-L-379-23. The *Castellanos* complaint was filed by and mirrored the complaint in *Palmer*, alleging violations of CFA and RETA. Two of twelve plaintiffs were dismissed at the outset based on statute of limitations defenses.  Discovery in the *Castellanos* matter closed in 2024, and a trial of the matter is currently scheduled to begin on September 29, 2025.

38.     The Debtor's exposure to the *Palmer* plaintiffs, and even to the additional 10 *Castellanos* plaintiffs might not, standing alone, necessitate the filing of this Chapter 11 Case. However, on April 27, 2023, counsel of record for the Plaintiffs in the *Palmer* litigation brought a putative class action before the Superior Court of New Jersey, captioned, *Michael Lantych, Sherman and Dorothy Norman vs. Flagship Resort Development Corporation, et al,* Docket No. ATL-L-00379-23, alleging some of the same types of claims upon which the *Palmer* Court had entered judgment, but this time on behalf of as many as 10,000 class members, and alleging damages exceeding $100 million.  On July 23, 2024, the court certified the class, with Michael Lantych, Sherman Norman, and Dorothy Norman, the lead plaintiffs, named as the Class Action Representatives.

8085755

39.     Given the $8.3 million owed to the Owners Associations, the Debtor's historically
reduced margins, the potential costs of defending a lengthy class action proceeding, not to mention
the risk of an adverse judgment therein, the Debtors were forced to seek Chapter 11 relief.

C.     **Retention of Restructuring Professionals and Preparation for Bankruptcy
With Stalking Horse Agreement and Debtor-in-Possession Financing[7]**

40.     On or about March 7, 2025, the Debtor engaged Porzio, Bromberg & Newman,
P.C. ("Porzio") as restructuring/bankruptcy counsel.   On or about April 1, 2025, the Debtor
engaged Emerald Capital Advisors LLC ("Emerald") as its financial advisory firm.   On May 8,
2025, the Debtor engaged Kroll Restructuring Administration, LLC as noticing and claims agent
having received quotes from a total of three (3) potential noticing agents/claims managers.[8]

41.     Prior to engaging Porzio and Emerald, and over at least a 9-month period
commencing in or around July of 2024, the Debtor reached out to numerous strategics in the
industry who might be interested in purchasing the Debtor's assets.   As a result of these efforts,
the Debtor proceeded to enter into negotiations with five (5) parties potentially interested in
purchasing the Debtor's assets, ultimately resulting in the execution of four (4) non-disclosure
agreements.   These four (4) remaining interested parties thereupon proceeded to conduct
extensive due diligence.   One (1) of these parties continues to conduct due diligence; however, it
did not execute a stalking horse term sheet or asset purchase agreement or term sheet prior to the
Petition Date.

42.     Therefore, and consistent with its fiduciary duties to maximize value shortly before
the Petition Date, the Debtor entered into a stalking horse term sheet (the "Stalking Horse Term

---

[7] Capitalized terms used in this section, but not defined, shall have the meaning ascribed to them in the Bid Procedures
Motion or the DIP Motion, as applicable.
[8] Specifically, Kroll will provide consulting services regarding legal noticing, claims management and reconciliation,
plan solicitation, balloting, disbursements, preparation of schedules of assets and liabilities and statements of financial
affairs, communications, as well as confidential online workspaces/data rooms.

8085755

Sheet") pursuant to which AC Boardwalk Investments, LLC ("AC Boardwalk"), an entity wholly owned by Kevin Jones and Roxanne Passarella. Pursuant to that Stalking Horse Term Sheet, AC Boardwalk agreed to purchase the Debtor's assets. [9] If approved as the highest and best offer, hopefully following an auction with robust and competitive bidding, AC Boardwalk will purchase the Debtor's assets and business under section 363 of the Bankruptcy Code. Under the Stalking Horse APA, the Stalking Horse Bidder proposes to acquire all assets of the Debtor for the sum of $5 million, plus a potential upward adjustment, plus assumption of both receivables financing arrangements with the Receivables Lenders in the total amount of approximately $40,524,948.27[10] as of the Petition Date. The total Stalking Horse bid therefore has a cash plus assumption of funded debt value of at least $45,524,948.27 (collectively, the "Sale Transaction"). As described in the Stalking Horse Term Sheet and the Bid Procedures Motion, AC Boardwalk's bid will serve as a Stalking Horse Bid that will be subject to higher or otherwise better offers at an Auction (to the extent that other qualified bids are submitted in accordance with bidding procedures approved by this Court).

43. In addition, and integral to the Stalking Horse APA, the Debtor, BOC, and Colebrook, entered into a DIP Loan Credit Agreement (the "DIP Credit Agreement") pursuant to which BOC and Colebrook have agreed to provide debtor-in-possession financing to the Debtor in the maximum amount of up to $5 million. The financing (the "DIP Financing") provides for $3,650,000 in new money to cover operating shortfalls and restructuring costs, and a rollup of just $1,251,547, roughly 1/3 to 1, with the rollup designed solely to cover protective advances made

---

[9] BOC, who will serve as a Co-DIP Lender with Colebrook, advised that it would not be interested in providing post-petition funding through the bankruptcy without a binding stalking horse contract or other clear path out of the bankruptcy. As a result, Kevin and Roxanne, through AC Boardwalk, agreed to bind themselves to purchase the Debtors assets.

[10] *See*, Section II, *supra*.

by the Lender in the weeks leading up to the Filing Date.  Annexed hereto as **Exhibit D** is the

Debtor's DIP Budget/13-week cash flow.  The proposed DIP Financing under the DIP Credit

Agreement is critical to the Debtor's ability to continue to operate in the ordinary course of

business pending the Auction and consummation of the Sale Transaction, or another transaction

that may result from the competitive bidding process proposed by the Debtor.  Thus, together, the

terms and conditions of the Stalking Horse APA and the DIP Financing provide the Debtor with

a transaction that is in the best interests of the Debtor's estate, subject only to any higher or

otherwise better bids that may be presented at the auction.

### D.    Go Forward Plan for The Business and this Chapter 11 Case

44.    Despite the bad news I report in Part III.A of this declaration, as has been reported in

the press, the timeshare industry has seen a rebound beginning at least as of November, 2022.[11]

Further, the Debtor has, over the last two years, adopted a "less is more" approach, focusing on higher

credit score buyers, who are much less likely to default.  As described above, defaults reduce the

Debtor's bottom line dramatically, as it remains obligated on the Accounts Receivables lines to the

Lenders for the full amount financed.  The strategy has borne dividends, with most recent data

revealing the Debtor's current interval purchasers have an average credit score of 25 points higher than

historical.  The Debtor continues to focus on upgrades to its facilities which furthers this approach.

45.    As a result, given the Debtor turning the corner with its financiers, and the balance

sheet relief that will come from this Chapter 11, the Debtor believes, in the exercise of its business

judgment, that consummation of the Sale Transaction (subject to any higher or otherwise better offers

that result from the Auction) will provide the best process under the circumstances to maximize value

for its stakeholders.  The Debtor will utilize Cash Collateral and proceeds of the DIP Facility proposed

---

[11]        https://www.spglobal.com/ratings/en/research/articles/221208-sf-credit-brief-u-s-timeshare-securitization-performance-is-stable-as-of-november-2022-12579999

8085755

by the DIP Credit Agreement, having obtained the consent of BOC and Colebrook for each to continue to obtain high credit score buyers, and keep defaults low.  Consensual use of Cash Collateral and the proceeds of the DIP Facility will provide the Debtor with sufficient liquidity to operate during the Chapter 11 Case, and, when combined with revenue from operations and proceeds from the Receivables Facilities, is projected to be sufficient to support continued operations and the administrative expenses of the Chapter 11 Case.

## IV.    **FIRST DAY MOTIONS**

46.    To minimize the adverse effects of the commencement of this Chapter 11 Case in a way that will allow the Debtor to maximize value of its estate, the Debtor has filed a number of First Day Motions designed to facilitate its transition into Chapter 11.

47.    I anticipate that the Court will conduct a hearing soon after the Petition Date at which the Court will hear and consider many of the First Day Motions.  Many of the First Day Motions seek authority to pay certain pre-petition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first twenty-one days following the filing of a chapter 11 petition, except to the extent that the relief requested is necessary to avoid immediate and irreparable harm. In light of this requirement, the Debtor has narrowly tailored its requests for immediate authority to pay pre-petition claims to instances where the failure to pay such claims would cause immediate and irreparable harm to itself and its estate.  Other relief will be deferred for consideration at a later hearing.

48.    I have reviewed each of the First Day Motions with Debtor's proposed counsel and the facts stated therein are true and correct to the best of my knowledge, information, and belief.  I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described

above, is necessary and critical to the Debtor's sale efforts, and is in the best interest of the Debtor's estate and creditors.  A discussion of the facts supporting, and the relief requested, in each of the First Day Motions follows.  I hereby adopt and affirm the factual representations contained in each of the First Day Motions.

### A.      Debtor's Application for Expedited Consideration of First Day Matters

49.      The Debtor requests entry of an Order granting expedited consideration of its First Day Motions.  I believe that the relief requested in this application is essential to avoid any disruption the commencement of this Chapter 11 Case may have on the Debtor, will facilitate the Debtor's orderly transition into Chapter 11, and will preserve the value of the Debtor's assets. Accordingly, I respectfully submit that the Debtor's request for expedited consideration of the First Day Motions be approved.

### B.      Debtor's Application Pursuant For Entry of an Order (I) Authorizing the Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief (The "Claims Agent Retention")

50.      The Debtor seeks entry of an Order appointing Kroll Restructuring Administration LLC ("Kroll") as claims and noticing agent in this Chapter 11 Case because it has significant experience in both the legal and administrative aspects of large, complex chapter 11 cases and its professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.  I believe that Kroll's appointment is the most effective and efficient manner of noticing creditors and parties-in-interest of the filing of and developments in this case.  In addition, Kroll will transmit, receive, docket and maintain proofs of claim filed in connection with this case. Accordingly, I believe that the appointment of Kroll to act as an agent of this Court is in the best

interests of the Debtor's estate, its creditors, and all parties-in-interest and respectfully submit that the Court should grant the Debtor's motion to appoint Kroll.

**E.    The Debtor's Motion for an Order Authorizing the Debtor an Extension of Time Within Which to File Statements And Schedules (the "<u>Schedules Extension Motion</u>")**

51.    The Debtor seeks entry of an order authorizing the Debtor to (a) extend the deadline by which the Debtor must file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 16 days, for a total of 30 days from the Petition Date to and including June 9, 2025, without prejudice of the Debtor's ability to request additional extensions for cause shown; and (b) granting related relief.

52.    Given the numerous tasks to which the Debtor and its professionals must attend to facilitate a smooth transition into chapter 11, the Debtor's professionals have not had an opportunity to review and analyze the information and documents necessary to complete the Schedules and Statements and are concerned that the Schedules and Statements may not be completed by the deadline established by Fed. R. Bankr. P. 1007(c). Rather than filing incomplete Schedules and Statements that would have to be amended at a later date, the Debtor seeks a limited extension of time to complete that task.

53.    Accordingly, for the reasons set forth herein and in the Schedules Extension Motion, I respectfully submit that the relief requested in the Schedules Extension Motion is in the best interests of the Debtor, its estate, and all parties-in-interest and will enable the Debtor to continue to operate its businesses and preserve the value of its estate. Absent the relief requested, the Debtor and its estate would suffer immediate and irreparable harm.

8085755

F.    **Debtor's Motion for Entry of Orders (I) (A) Approving Bidding Procedures For the Sale of Substantially all of The Debtor's Assets, (B) Approving Stalking Horse Purchase Agreement, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form And Manner of Notice Thereof, (E) Establishing Notice and Procedures For The Assumption And Assignment of Contracts and Leases, and (F) Granting Related Relief, and (II) (A) Authorizing the Debtor to Enter Into an Asset Purchase Agreement, (B) Approving the Asset Purchase Agreement, and (C) Authorizing the Assumption and Assignment of the Assumed Contracts (the "<u>Bid Procedures Motion</u>")**

54.    In the Bid Procedures Motion, the Debtor proposes an expeditious, public, and flexible bidding and sale process to pursue a going concern transaction that is substantially similar to those procedures by other companies in similar circumstances.  The Debtor seeks entry of an order:

a)    authorizing the authorizing and approving the Bid Procedures attached to the Bid Procedures Order as Exhibit 1 (the "<u>Bid Procedures</u>");

b)    establishing the following dates and deadlines in connection with the Bid Procedures:

- <u>Bid Deadline</u>: July 14, 2025, at 4:00 p.m., prevailing Eastern Time
- <u>Auction</u>: July 16, 2025, at 10:00 a.m., prevailing Eastern Time
- <u>Sale Hearing</u>: July 18, 2025, at 10:00 a.m., prevailing Eastern Time

c)    authorizing entry into the stalking horse agreement (the "<u>Stalking Horse APA</u>")[12] by and between the Debtor and AC Boardwalk Investments, LLC (the "<u>Stalking Horse Bidder</u>") which shall conform substantially and in all material respects to the binding term sheet attached as Exhibit 2 (the "<u>Stalking Horse Term Sheet</u>") to the Bid Procedures Order;

d)    authorizing the form and manner of notice of an auction (the "<u>Auction</u>") and sale hearing (the "<u>Sale Hearing</u>") with respect to the sale of the assets free and clear of liens, claims, encumbrances, and other interests, other than the Assumed Liabilities[13] (the "<u>Sale</u>"), attached as Exhibit 3 to the Bid Procedures Order (the "<u>Sale Notice</u>");

e)    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "<u>Contracts</u>") in

---

[12] The Debtor anticipates filing the Stalking Horse APA with the Bankruptcy Court within ten (10) days after the Petition Date.

[13] As defined in the Stalking Horse Term Sheet and the Stalking Horse APA.

connection with the Sale (the "<u>Assumption and Assignment Procedures</u>"), including notice of proposed cure payments; and

f)      granting related relief.

55.     If the Debtor is unable to implement a sale transaction, the Debtor will not have sufficient liquidity to continue to operate in the ordinary course and will be forced to wind-down its operations.  Accordingly, for the reasons set forth herein and in the Bid Procedures Motion, I respectfully submit that the relief requested in the Bid Procedures Motion is in the best interests of the Debtor, its estate, and all parties-in-interest and will enable the Debtor to continue to operate its businesses and preserve the value of its estate.  Absent the relief requested, the Debtor and its estate would suffer immediate and irreparable harm.

**G.    Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to (I) Continue Use of Its Cash Management System, (II) Maintain Its Existing Bank Accounts, And (III) Continue Use of Its Existing Business Forms, (B) Granting Administrative Priority Status to Postpetition Allocation Claims, and (C) Authorizing Continued Performance Under Allocation Arrangements and Historical Practices (the "<u>Cash Management Motion</u>")**

56.     In the Cash Management Motion, the Debtor seeks entry of interim and final orders: authorizing the Debtor to (a) continue to operate its Cash Management System and maintain its existing Bank Accounts, (b) honor certain prepetition or postpetition obligations related thereto, (c) maintain existing Business Forms and Books and records in the ordinary course of business, and (d) continue to perform Allocation Transactions consistent with historical practice.

57.     In the ordinary course of business, the Debtor operates a cash management system (the "<u>Cash Management System</u>") to facilitate the efficient operation of the Debtor's business and to seamlessly collect, transfer, and disburse funds generated by the Debtor's operations, which collectively is the Cash Management System.  The Cash Management System is comparable to the

cash management systems used by other similarly sized companies to help manage funds, reduce administrative expenses, and ensure cash availability for each entity and to meet obligations.

58.    The Debtor requests authority to continue its Cash Management System as requiring the Debtor to adopt a new, segmented cash management system during the Chapter 11 Case would be expensive, burdensome, and unnecessarily disruptive to the Debtor's operations.  Importantly, the Cash Management System provides significant benefits to the Debtor, including, among other things, the ability to (a) track and control corporate funds, (b) ensure the maximum availability of funds when and where necessary, and (c) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System would be extremely detrimental to the Debtor's operations, as the Debtor's business requires prompt access to cash to operate.

59.    Due to the intertwined nature of their businesses, the Debtor, Boardwalk, and the Ownership Associations share several employees (the "Shared Employees") in addition to certain services and contracts (the "Shared Services") in order to operate their businesses efficiently and reduce overhead costs.  In the ordinary course of business, the Debtor maintains and engages in routine cost allocation arrangements with Boardwalk and the Ownership Associations (such transactions being referred to as the "Allocation Transactions"), resulting in receivables and payables between the Management Companies, the Ownership Associations, and the Debtor (the "Allocation Balances").  The Allocation Transactions are an essential component of the Debtor's operations, and they are integral to the Debtor's ability to process payroll and payments to third-party vendors, market and develop qualified leads that convert into timeshare unit sales, provide administrative and support services to the Debtor's properties, and otherwise facilitate operations on a daily basis.  The Debtor generally accounts for and records all Allocation Transactions and

Allocation Balances in its centralized accounting system, the results of which are recorded on the Debtor's balance sheets and regularly reconciled.  The Allocation Transactions are an essential component of the Debtor's operations and Cash Management System.  Any interruption of the Allocation Transactions would severely disrupt the Debtor's operations and greatly harm the Debtor's estate and its stakeholders.  Continued use of the Shared Services and Shared Employees is integral to maintaining the Debtor's employee base, operating without disruption, and preserving profitability and value of the properties it sells.

60.     Maintaining the current Cash Management System, including continuing the Allocation Transactions will facilitate the Debtor's transition into chapter 11 by, among other things, minimizing delays in paying post-petition debts and eliminating administrative inefficiencies.

61.     Accordingly, for the reasons set forth herein and in the Cash Management Motion, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtor, its estate, and all parties-in-interest and will enable the Debtor to continue to operate its businesses and preserve the value of its estate. Absent the relief requested, the Debtor and its estate would suffer immediate and irreparable harm.

**H.     Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "Tax Motion")**

62.     In the Tax Motion, the Debtor requests entry of interim and final orders authorizing, but not directing, the payment of sales and use taxes and property taxes in the ordinary course of business and without regard to whether such obligations accrued or arose before or after the Petition Date.

63.     In the ordinary course of business, the Debtor (a) incurs and/or collect taxes, including sales, use, property, business, income, and miscellaneous taxes, in the operation of its business

(collectively, the "Taxes and Fees"),[3] and (b) pays and remits the Taxes and Fees to various federal, state, and local taxing, licensing, administrative, and governmental or similar authorities (collectively, the "Authorities").

64.     The Debtor pays and remits the Taxes and Fees at various intervals throughout the year, including monthly, quarterly, semi-annually, or annually, in each case as required by applicable laws, rules, or regulations. The Debtor estimate that approximately $27,200 in Taxes and Fees is outstanding as of the Petition Date

65.     Any failure by the Debtor to pay the Taxes and Fees could materially disrupt the efficient administration of the Chapter 11 Case in several ways, including (but not limited to): (a) the Authorities may initiate audits of the Debtor, which would unnecessarily divert the Debtor's attention from this Chapter 11 Case; (b) may result in increased tax liability for the Debtor if interest and penalties accrue on the unpaid Taxes and Fees; (c) the Authorities may attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that would harm the estate; and (d) in certain instances, the Debtor's directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from its duties related to the Debtor's Chapter 11 Case.  Additionally, failure to pay Taxes and Fees when due may result in fines and penalties, the accrual of interest, or in addition, nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.

66.     The Debtor's timely payment of the Taxes and Fees is critical to maintaining the value of the Debtor's estate.  For the reasons set forth herein and in the Tax Motion, I respectfully submit that the relief requested in the Tax Motion is in the best interest of the Debtor's estate and creditors. Absent the relief requested in the Tax Motion, the Debtor and its estate could suffer immediate and irreparable harm.

8085755

I.      **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion")**

67.     In the Wages Motion, the Debtor seeks entry of interim and final orders: authorizing the Debtor to (a) pay prepetition employee wages, salaries, other compensation, and reimbursable employee expenses, and (b) continue employee benefits programs; and granting related relief.

68.     In the course of its business, the Debtor employs approximately 101 Employees consisting of full-time, part-time, and intermittent employees whose hours vary on a seasonal or project-by-project basis.  None of the Employees are party to a collective bargaining agreement or similar labor agreement.  The Debtor estimate that $90,000 of Employee Wage Obligations have accrued and remain unpaid as of the Petition Date, in addition to any other outstanding obligations under the Employee Wages and Benefits Programs and described in the Wages Motion.

69.     In order to ensure that the Debtor can continue to provide its customers with the highest levels of service, maintain high employee morale and low attrition rates, and minimize the personal hardship to the Employees, the Debtor in the Wages Motion seeks to continue to pay and honor prepetition Employee Wages and Health Benefit Plans.

70.     Payment of the Employee Obligations is warranted in this Chapter 11 Case.  The majority of the Employees rely exclusively on payment of the Employee Obligations to satisfy its daily living expenses.  Consequently, Employees will be exposed to significant financial difficulties if the Debtor are not permitted to honor unpaid Employee Obligations.  Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of this Chapter 11 Case on the Debtor's business operations.

8085755

71.     The Employees provide the Debtor with services necessary to conduct the Debtor's business, and the Debtor believe that, absent the Debtor timely honoring the Employee Obligations, the Debtor may experience turnover and instability at this critical time in this Chapter 11 Case. Without timely honoring the Employee Obligations, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees face.  Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtor's business is tied to its workforce, which cannot be replaced without significant efforts—efforts that might not be successful given the overhang of this chapter 11 case.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  Honoring the prepetition obligations with respect to the Employee Obligations, including making timely payments as applicable on account thereof, is a necessary and critical element of the Debtor's efforts to preserve value and will give the Debtor the greatest likelihood of retention of its Employees as the Debtor seek to operate its business in this chapter 11 case.

72.     Accordingly, for the reasons set forth herein and in the Wages Motion, I respectfully submit that the relief requested in the Wages Motion is in the best interests of the Debtor, its estate, and all parties-in-interest and will enable the Debtor to continue to operate its businesses and preserve the value of its estate.  Absent the relief requested, the Debtor and its estate would suffer immediate and irreparable harm.

**J.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Its Prepetition Insurance Programs and (B) Pay All Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "<u>Insurance Motion</u>")**

73.     In the Insurance Motion, the Debtor seeks entry of interim and final orders: (a) authorizing the Debtor to (i) continue its prepetition Insurance Programs in the ordinary course

of business, including the Debtor's practice of renewing, supplementing, and entering into new insurance policies, and (ii) pay all prepetition obligations in respect of these programs, including premiums, deductibles, retrospective adjustments, administrative fees, broker's fees, and other costs relating thereto, and (b) granting related relief.

74.    With the assistance of its Insurance Broker, maintains insurance policies and related agreements (each an "Insurance Program," and collectively, the "Insurance Programs") with multiple third-party insurance carriers.  The Insurance Programs provide coverage for, among other things, directors' and officers' liability, bond liability, auto liability, and cyber liability. Some of these policies provide coverage to the Debtor through coverage provided under policies named in favor of the FRG, Management Companies, or Ownership Associations.  Additionally, the Debtor also receives certain other insurance coverages—such as general liability—that the Debtor does not pay directly but rather provides payment to FRG, the Management Companies, or the Owner Associations for said coverage.  While the Debtor believe they are current on its obligations, it is anticipated that certain Insurance Premiums will become due and owing during this Chapter 11 Case.

75.    The nature of the Debtor's business and this Chapter 11 Case render it essential for the Debtor to maintain its Insurance Programs on an ongoing and uninterrupted basis.  The non-payment of any premiums or related fees under the Insurance Programs could result in one or more of the Insurance Carriers terminating or declining to renew the Insurance Programs or refusing to enter into new insurance policies with the Debtor.  If any of the Insurance Programs lapse, the Debtor could be exposed to substantial liability or property damages, to the detriment of all parties in interest.

8085755

76.     Accordingly, for the reasons set forth herein and in the Insurance Motion, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtor, its estate, and all parties-in-interest and will enable the Debtor to continue to operate its businesses and preserve the value of its estate. Absent the relief requested, the Debtor and its estate would suffer immediate and irreparable harm.

### K.      Utilities

77.     Utilities for the Debtor's 774 units, as well as for all common areas, are all paid by, and are the obligations of the respective non-debtor Ownership Associations.  The Debtor pays dues to the Ownership Associations[14] which are used, along with the dues received from interval and condominium owners, to pay various obligations of the Ownership Associations, including utilities.  However, the Debtor has no direct relationship with or obligations to any utility provider. As a result, the Debtor is not seeking First Day Motion Relief with respect to utilities.

78.     The Debtor also seeks relief pursuant to the DIP Motion and *the Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtor To Obtain Post-Petition Financing Pursuant To The Existing Receivables Facilities, (II) Modifying Same And The Automatic Stay, (III) Scheduling A Final Hearing And (IV) Granting Related Relief* (the "Receivables Motion"), the support for which can be found in the *Declaration of John Madden in Support of Debtor's Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtor To Obtain Postpetition Financing, (II) Authorizing Use Of Cash Collateral And Affording Adequate Protection; (III) Granting Liens And Providing Superpriority Administrative Expense Status; (IV) Modifying Automatic Stay; (V) Scheduling A Final Hearing; And (VI) Granting Related Relief (the "DIP Motion") and the Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtor To*

---

[14] Although the Debtor is in serious arrears on its obligations to the Ownership Associations, go-forward amounts are budgeted for in the DIP and will be paid in the ordinary course post-petition.

*Obtain Post-Petition Financing Pursuant To The Existing Receivables Facilities, (II) Modifying Same And The Automatic Stay, (III) Scheduling A Final Hearing And (IV) Granting Related Relief*, filed contemporaneously herewith.

### **CONCLUSION**

This declaration describes the factors that have precipitated the commencement of the Chapter 11 Case and demonstrates the critical need for the Debtor to obtain the relief sought in the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my information and belief.

Dated: May 12, 2025                                                */s/ Cherie Parks*
                                                                                    Cheri Parks
                                                                                    Chief Financial Officer

30

8085755