UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
Lauren Bielskie, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: jeffrey.m.sponder@usdoj.gov
         lauren.bielskie@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
| In re: | : |  |
|  | : | Case No. 25-15047 (JNP) |
| Flagship Resort Development | : |  |
| Corporation,[1] | : |  |
|  | : | The Honorable Jerrold N. Poslusny |
| Debtor. | : |  |
|  | : | Hearing Date: August 4, 2025 at 11:00 a.m. |
|  | : |  |

**UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO THE DISCLOSURE STATEMENT FOR THE PLAN OF LIQUIDATION OF FLAGSHIP RESORT DEVELOPMENT CORPORATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT ON AN INTERIM BASIS; (II) SCHEDULING A COMBINED HEARING ON FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND PLAN CONFIRMATION AND DEADLINES RELATED THERETO; (III) APPROVING THE SOLICITATION, NOTICE, AND TABULATION PROCEDURES AND THE FORMS RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S.

Trustee"), through his undersigned counsel, hereby objects to: **(a)** conditional approval of the

*Disclosure Statement for the Plan of Liquidation of Flagship Resort Development Corporation*

---

[1] The Debtor in this chapter 11 case, along with the last four digits of each Debtor's federal tax identification number is Flagship Resort Development Corporation (1067).  The mailing address for the Debtor for purposes of this chapter 11 case is 60 North Maine Avenue, Atlantic City, NJ 08401.

*Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. 174] (the "Disclosure Statement"); and **(b)**

the *Debtor's Motion for Entry of an Order (i) Approving the Disclosure Statement on an Interim*

*Basis; (ii) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and*

*Plan Confirmation and Deadlines Related Thereto; (iii) Approving the Solicitation, Notice, and*

*Tabulation Procedures and the Forms Related Thereto; and (iv) Granting Related Relief* [Dkt.

176] (the "Procedures Motion"),[2] and respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The Court should deny conditional approval of the Disclosure Statement for the

following separate and independent reasons:

(a)     **The Disclosure Statement fails to provide adequate disclosures regarding the third-party release provisions of the Debtor's proposed Plan.** The Disclosure Statement fails to provide adequate information as to who will be deemed to give third-party releases, who will receive such releases, what claims are being released, the value of such claims, and the consideration received in exchange for the releases. The Debtor falls far short of meeting its burden under section 1125 of the Bankruptcy Code.

(b)     **The Debtor's proposed Plan is patently unconfirmable and should not be solicited using procedures that facilitate the Plan's defects.** The Court must deny interim approval of a disclosure statement if the related proposed plan is not confirmable on its face. Here, the proposed Plan is unconfirmable for at least two reasons:

(i)     in contravention of United States Supreme Court precedent and applicable state law, the proposed Plan extracts non-consensual third-party releases from the following parties— none of which are entitled to vote on the Plan—unless they check an opt-out box on an opt-out form: (a) holders of claims or interests that are deemed to accept the Plan; (b) holders of claims or interests that are deemed to reject the Plan; and (c) parties who will receive no notice under the Plan; and

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement and the Procedures Motion (including exhibits), as applicable.

(ii)    to the extent that exculpation is permissible beyond the provisions of Bankruptcy Code section 1125(e), the proposed Plan's exculpation provision violates controlling Third Circuit case law by attempting to shield non-fiduciaries of the Debtor's estates and conduct occurring before the Petition Date and after the Plan's Effective Date.

2.    In addition, the Court should deny conditional approval of the Disclosure Statement because the Debtor has not established any basis or support for waiving the 14-day stay pursuant to Fed. R. Bankr. P. 3020(e).

3.    Further, the Court should deny the Procedures Motion because it furthers the Debtor's attempt to obtain third-party releases through an opt-out procedure.

4.    Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order or orders **(a)** denying conditional approval of the Disclosure Statement and **(b)** denying the Procedures Motion.

## JURISDICTION AND STANDING

5.    This Court has jurisdiction to hear and determine the Procedures Motion, interim approval of the Disclosure Statement, and this Objection pursuant to: **(i)** 28 U.S.C. § 1334; **(ii)** applicable orders of the United States District Court of the District of New Jersey issued pursuant to 28 U.S.C. § 157(a); and **(iii)** 28 U.S.C. § 157(b)(2).

6.    Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog"). Under 28 U.S.C. § 586(a)(3)(B) the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

7.      The U.S. Trustee has standing to be heard on the Procedures Motion, the Disclosure

Statement, and this Objection pursuant to 11 U.S.C. § 307.  *See U.S. Tr. v. Columbia Gas Sys.,*

*Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee

has "public interest standing" under section 307, which goes beyond mere pecuniary interest).

## BACKGROUND

### A.      The Chapter 11 Case

8.      On May 10, 2025, Flagship Resort Development Corporation (the "Debtor")

commenced this Chapter 11 Case by filing a voluntary petition for relief pursuant to chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or "Code").

*See* Dkt. 1.

9.      The Debtor continues to manage and operate its business as a debtor in possession

pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10.      On May 30, 2025, the U.S. Trustee appointed an official committee of unsecured

creditors (the "Committee").  *See* Dkt. 86.

11.      As of the date hereof, no trustee or examiner has been requested or appointed.

### B.      The Debtor and its Business

12.      The Debtor was incorporated on December 30, 1996.  *See* Dkt. 174 at Art. II.A,

page 17 of 66.  It is a privately held hospitality and resort development company headquartered in

New Jersey, with a particular focus on timeshare vacation ownership opportunities in the Atlantic

City region.  *See id.*  FantaSea Resorts Group, Inc. ("FRG"), established in 1993, is a holding

company and the Debtor's non-Debtor parent.  *See id.*

13.      The Debtor developed a multi-tiered ownership platform encompassing deeded

timeshare interests, club memberships, and exchange-based travel benefits at three properties

including the Flagship Resort, the Atlantic Palace Suites, and La Sammana Resort.  *See id.* at page

18.  The Debtor's portfolio is comprised of a total of 774 living units across the three properties.

*See id.*  The 774 living units translate into some 37,000+ timeshare interval units either sold to

deeded owners or unsold, and spread among the three properties the Debtor owned and operated

as of the Petition Date.  *See id.*  The Debtor describes the properties as follows:  (i) The Flagship

Resort, which is located at 60 North Maine Avenue in Atlantic City, and is a 32-story tower

housing over 440 units, and which features amenities such as an indoor swimming pool, fitness

center, arcade, and Kelsey & Kim's Oceanview restaurant, where floor-to-ceiling windows

provide a direct view of the Absecon Inlet and Brigantine Beach; (ii) The Atlantic Palace, which

is located at 1507 Boardwalk in Atlantic City, and is a 31-story resort with approximately 292

suites, and which offers an outdoor pool, fitness center, and game room, and is conveniently

located on the Atlantic City Boardwalk, near various entertainment venues; and (iii) La Sammana

Resort, which is located at 1400 West Brigantine Avenue in Brigantine, New Jersey, and is a 5-

story boutique-style resort comprising 62 units, and which features a rooftop pool, fitness center,

and media room.  *See id.*

## C.    The Disclosure Statement, Plan and the Procedures Motion

14.    On July 1, 2025, the Debtor filed the Disclosure Statement and Plan Of Liquidation

of Flagship Resort Development Corporation Pursuant to Chapter 11 of the Bankruptcy Code (the

"Plan").  *See* Dkts. 174 and 175.

15.    On the same day, the Debtor filed the Procedures Motion seeking conditional

approval of the Disclosure Statement, the scheduling of a combined hearing concerning the

Disclosure Statement and confirmation of the Plan and approving solicitation procedures.  *See* Dkt.

176.

5

**D.      Specific Provisions of the Plan**

16.      The Plan includes the following provisions relevant to this Objection.

**i.      Third-Party Release Provisions**

17.      Article VII.D.2 of the Plan broadly provides that each of the Released Parties[3] "will

be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and

discharged, by the Releasing Parties,"[4] which includes Holders of Claims.[5]  *See* Dkt. 175 at Art.

---

[3] The Plan defines "Released Party" as follows:

    (a) the Debtor; (b) the DIP Agent; (c) BOC, in its capacity as DIP Lender; (d) Colebrook, in its
    capacity as DIP Lender (e) BOC, in its capacity as Receivables Lender (f) Colebrook, in its capacity
    as Receivables Lender, (g) the Committee and each of its members; and (h) each Related Party of
    each Entity in clause (a) through this clause (g), but not including any Excluded Party.

*See* Dkt. 175 at Art. I.A 118, at page 16 of 50.

[4] The Plan defines "Releasing Parties" as follows:

    (a) the Debtor; (b) the Post-Effective Date Debtor; (c) the DIP Agent; (d) BOC, in its capacity as
    DIP Lender; (e) Colebrook, in its capacity as DIP Lender; (f) BOC, in its capacity as a Receivables
    Lender; (g) Colebrook, in its capacity as a Receivables Lender; (h) all Holders of Claims who are
    deemed to accept the Plan but who do not affirmatively opt out of the releases provided for in the
    Plan by checking the box on the applicable notice of non-voting status indicating that they opt not
    to grant the releases provided for in the Plan; (i) all Holders of Claims who abstain from voting on
    the Plan, other than those who were not sent a ballot or an opt out form, and who do not affirmatively
    opt out of the releases provided for in the Plan by checking the box on the applicable ballot indicating
    that they opt not to grant the releases provided for in the Plan; (j) all Holders of Claims or Interests
    who vote to accept or reject the Plan and who do not affirmatively opt out of the releases provided
    for in the Plan by checking the box on the applicable ballot indicating that they opt not to grant the
    releases provided for in the Plan; (k) each current and former Affiliate of each Entity in clause (a)
    through (k); and (l) each Related Party of each Entity in clause (a) through (k) for which such Entity
    is legally entitled to bind such Related Party to the releases contained in the Plan under applicable
    law; *provided* that, for the avoidance of doubt, an Entity in clause (a) through clause (k) shall not be
    a Releasing Party if it: (x) has not received a ballot or non-voting status form due to the same being
    returned as undeliverable; or (y) elects to opt out of the releases contained in the Plan; or (z) timely
    objects to the releases contained in the Plan and such objection is not withdrawn or otherwise
    resolved before the Confirmation order is entered.

*See* Dkt. 175 at Art. I.A119, page 16 of 50.

[5] The Plan provides for a release by Holders of Claims as follows:

    Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the
    Effective Date, each of the Released Parties, will be deemed conclusively, absolutely,
    unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each
    case on behalf of itself and its respective successors, assigns, and representatives and any and all
    other Persons that may purport to assert any Cause of Action directly or derivatively, by, through,

for, or because of the foregoing Persons, including Related Parties, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtor or the Estate), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor or the Estate, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtor and any Released Party, the Receivables Facilities, the distribution of any Cash or other property of the Debtor to any Released Party, the assertion or enforcement of rights or remedies against the Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the Debtor's in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Case, any intercompany transactions, the negotiation and consummation of the any sale of the Debtor's assets, the negotiation, formulation, or preparation of the Plan, Disclosure Statement, Plan Supplement, or related agreements, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the solicitation of votes with respect to the Plan, the DIP Facility, the DIP Loan Documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided*, *however*, that the foregoing releases shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct.

Notwithstanding anything to the contrary in the foregoing, the following shall not, pursuant to the releases set forth above, be released: (i) any Retained Causes of Action, (ii) any post-Effective Date obligations of any party of Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (iii) the rights of Holders of Allowed Claims to receive distributions under the Plan; or (iv) the Excluded Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases provided in this Article VII.D.2., which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the releases provided in this Article VII.D.2. are: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the releases contained in this Article VII.D.2.; (v) in the best interests of the Debtor and its Estate; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to this Article VII.D.2.

*See* Dkt. 175 at Art. VII.D.2, pages 40 and 41 of 50.

VII.D.2, pages 40 and 41 of 50.  These include Claims and Causes of Action that are "liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise[.]" *See id.*

18.     Holders of Claims in Classes 3-5 and Holders of Interests in Class 8 are either unimpaired or are insiders or Affiliates of the Debtor; as a result, they are either presumed to have accepted the Plan or deemed to have rejected it, and so are not entitled to vote on the Plan. *See id.* at Art. III.B & C, pages 22-25 of 50.  Instead, they will receive a Notice of Non-Voting Status and Opt-Out Election Form. *See* Dkt. 176 at page 15 of 24 and Dkt. 176-1 at Exhibit B, page 22-35 of 68.

19.     The Notice of Non-Voting Status and Opt-Out Election Form that will be sent to members of Classes 3-5 and 8 specifies that a recipient who fails to timely and properly submit an Opt-Out Election Form to the Balloting Agent by the Opt-Out Deadline with the opt-out box checked will be deemed to have consented to the Article VII.D.2 third-party releases.[6] *See* Dkt. 176-1 at Exhibit B, pages 31-35 of 38.  The Notice of Non-Voting Status and Opt-Out Election Form includes information about, and instructions for, the Opt-Out. *See id.*

20.     Holders of Claims in Classes 1, 2, 6, and 7 are entitled to vote under the Plan. *See id.* at Art. III.B & C, pages 22-25 of 50.  The ballots to be provided to the voting classes include an opt-out election. *See* Dkt. 176-1 at Exhibits C.1-C.4, pages 36-68 of 68.  The opt-out election

---

[6] It is unclear from the Procedures Motion, including the Notice of Non-Voting Status and the Opt-Out Election Form, whether a member of the non-voting classes could file an objection in lieu of an Opt-Out Election Form if it does not consent to granting the third-party releases.

provides that a claimant will be deemed to provide the releases contained in Article VII.D.2 of the

Plan unless the box is checked and the ballot submitted to the Balloting Agent prior to the Voting

Deadline.[7]  *See id.* at pages 40, 49, 58 and 66 of 68.  However, the voting classes opt-out election

does not include the same information and instructions provided to Holders of Claims in Classes

1, 2, 6 and 7.

### ii.   Exculpation Provision

21.   Article VII.C of the Plan is an exculpation provision[8] for Exculpated Parties.[9]  *See*

Dkt. 175 at Article VII.C, pages 38 and 39 of 50.

---

[7] The opt-out election in Exhibit C.1 of the Procedures Motion provides an opt-out for Class 1 that would include the releases set forth in Article X.D of the Plan.  *See* Dkt. 176-1 at Exhibit C.1, page 41 of 68.  However, there are no releases referred to in Article X.D. of the Plan.  Instead, the provision should be changed to refer to Article VII.D.2 of the Plan, which is the third-party release.

[8] The Plan's exculpation provision states as follows:

> Effective as of the Effective Date, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement and any Sale Transactions, the pursuit of Confirmation, the pursuit of consummation of a Sale Transaction, the administration and implementation of the Plan, the distribution of property under the Plan or any other related agreement, except for Claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any Claim relating to any post-Effective Date obligations of any party or Entity under the Plan, any Sale Transaction, or any document, instrument, or agreement (including the other documents, instruments and agreements set forth in the Plan Supplement) executed to implement the Plan.

*See* Dkt. 175 at Art. VII.C, pages 38 and 39 of 50.

[9] The Plan defines "Exculpated Party" as "collectively, and in each case in its capacity as such: (a) the Debtor and Post-Effective Date Debtor; (b) the Creditors' Committee; and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former control persons, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys,

E.    **The Procedures Motion**

22.    On July 1, 2025, the Debtor filed the Procedures Motion.  *See* Dkt. 176.

23.    A hearing on the Procedures Motion was originally scheduled for July 18, 2025, which was subsequently adjourned to August 1, 2025.  As a result, it appears that there may need to be some revisions concerning the dates selected for solicitation and for confirmation.  To the extent the Debtor seeks to revise the dates contemplated in the Procedures Motion, the U.S. Trustee reserves his rights to object to such dates.  Later in this Objection., the U.S. Trustee provides alternate dates.

24.    The Debtor proposes sending to Holders of Claims in Classes 1, 2, 6 and 7 the Solicitation Packages containing, among other things, the Disclosure Statement with the Plan attached as an exhibit.  *See id*. at page 14 of 24.  The Solicitation Package sent to Holders of Claims in Classes 1, 2, 6, and 7 will include a cover letter, the Disclosure Statement, Plan and all exhibits thereto, the Interim Approval and Procedures Order, the Confirmation Hearing Notice, and the Ballot including voting instructions.  *See id.* at page 14 of 24.

25.    In contrast, the Debtor proposes to send Holders of Claims in Classes 3-5, and Holders of Interests in Class 8, only a Notice of Non-Voting Status and Opt-Out Election Form to Holders of Claims in Classes 3-5 and Holders of Interests in Class 8.  Non-voting classes will not receive copies of the Disclosure Statement and Plan.  *See id.* at page 15 of 24.  As the non-voting classes also have the right to object to the Disclosure Statement and Plan, the non-voting classes should receive copies of the Disclosure Statement and Plan same as the voting classes will receive.

---

accountants, investment bankers, consultants, representatives, and other professionals, but only to the extent that such party served in such a capacity during the Chapter 11 Case.  *See* Dkt. 175 at Art. I.A 66, page 11 of 50.

## OMNIBUS OBJECTION

I.    **The Disclosure Statement Lacks Adequate Information Regarding the Plan's Release Provisions**

26.    Under Bankruptcy Code section 1125, a plan proponent must obtain approval of a disclosure statement that provides "adequate information" sufficient to enable recipients "to make an informed judgment about the plan[.]"  *See* 11 U.S.C. § 1125(a).  The section 1125 disclosure requirement is "crucial to the effective functioning of the federal bankruptcy system," and "the importance of full and honest disclosure cannot be overstated."  *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417-18 (3d Cir. 1988)).

27.    "Adequate information" for purposes of section 1125 is "determined by the facts and circumstances of each case."  *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).  "The debtor has the burden of proving that a disclosure statement is adequate, including showing that the plan is confirmable or that defects might be cured or involve material facts in dispute."  *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012).

28.    In addition, Code section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions including section 1125.  *See* 11 U.S.C. § 1129(a)(2).  A chapter 11 plan cannot be confirmed unless it complies with the provisions of section 1129(a).  *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000).  The plan proponent bears the burden of proof with respect to each element of section 1129(a).  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

29.    To be approved, a disclosure statement must include sufficient information to apprise creditors and equity interest holders of the risks attendant to the proposed plan.  *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).  As a result, Code section 1125 is geared

11

towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  Thus, section 1125 "sets a floor, not a ceiling," regarding the information that must be disclosed.  *See Century Glove*, 860 F.2d 94, 100 (3rd. Cir. 1988).

30.     Here, the Disclosure Statement does not provide adequate information because it does not identify all parties who will receive releases.  That is because the definition of "Related Party" includes "current and former directors, managers, officers, committee members, board members of the Debtor, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees."[10]  *See* Dkt. 175 at Art. 1.A 117, pages 15 and 16 of 50.

31.     In addition, the Disclosure Statement does not adequately disclose **(a)** why the Released Parties are receiving releases under the Plan, **(b)** the nature and value of the claims being released, or **(c)** what (if anything) is being provided as consideration for the releases.

32.     Because the Disclosure Statement fails to provide adequate information as to these significant issues, it should not be approved on a conditional basis.

---

[10] Under the Plan, "Related Parties" are "Released Parties."  *See* Dkt. 175 at page 16 of 50.

II.     **The Court Must Deny Approval of the Disclosure Statement Because the Plan is Patently Unconfirmable**

33.     As the Third Circuit has held, "a '[c]ourt should not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable because it does not comply with [confirmation requirements].'" *See Am. Cap. Equip.*, 688 F.3d at 154; *see also In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile.") (citing *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003); *In re 266 Wash. Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); and *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

34.     Moreover, this Court should not approve solicitation procedures that facilitate the Plan's defects, as it would be a waste of estate resources for the Debtor to solicit votes on a plan that is patently unconfirmable.

35.     Here, the Court must deny approval of the Disclosure Statement because the Plan is patently unconfirmable for at least two separate and independent reasons.  First, the Plan is unconfirmable because it proposes non-consensual third-party releases that are not authorized under the Bankruptcy Code.  Second, to the extent that exculpation is permissible beyond what is expressly provided for in section 1125(e) of the Bankruptcy Code, the Plan's Exculpation Provision exceeds the limitations imposed by courts in this Circuit.

A.     **The Plan is Not Confirmable Because it Proposes Non-Consensual Third-Party Releases That Are Not Authorized Under the Bankruptcy Code.**

i.     **Introduction**

36.     The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual

releases of, or injunctions barring, claims between them.  *See* 603 U.S. 204, 209, 227 (2024).  The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release."  *See id.* at 226.

37.     A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law.  As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement.  *See P*urdue, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up).  A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

38.     Here, there is no existing release agreement between non-debtors.  Debtor instead seeks approval of a plan that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent.  This would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

39.     Three inconsistent tests have been suggested for determining whether a third-party release included in a bankruptcy court order is consensual:  (1) it is only consensual when there is valid consent under applicable state contract law[11]; (2) parties who do not opt out can be deemed to have consented because class-action settlements are binding on those who do not opt out[12]; and

---

[11] *See, e.g., In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024); *Emerge Energy Services, LP,* No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019); *In re Digital Impact, Inc.*, 223 B.R. 1, 14-15 (Bankr. N.D. Okla. 1998); *In re Arrowmill Dev. Corp.,* 211 B.R. 497, 507 (Bankr. D.N.J. 1997).

[12] *See, e.g., In re Robertshaw US Holding Corp.,* 662 B.R. 300, 323 n.120 (Bankr. S.D. Tex. 2024).

(3) parties can be deemed to have consented the same way that a litigant may forfeit rights by

failing to timely respond in litigation.[13]

40.     The first test is the correct one.  State law governs whether non-debtors have agreed

to release each other.  *See infra* Part A.  Nothing in the Bankruptcy Code allows parties to disregard

state law when debtors seek to impose third-party releases in their plans.  Under New Jersey law,

the choice of law under the Plan, as in other states, silence is not acceptance of an offer other than

in limited circumstances inapplicable here.  The Debtor thus cannot deem those who fail to opt out

to have released claims because those claimants have not agreed to the third-party release under

state law.

### ii.     State Contract Law

41.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of

claims."  *See Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-

451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979).  Thus, courts apply

state law when the question is whether a debtor has entered a valid settlement agreement.  *See*

*Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy

law fails to address the validity of settlements and this gap should be filled by state law."); *De La*

*Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009)

("Where the United States is not a party, it is well established that settlement agreements in

pending bankruptcy cases are considered contract matters governed by state law.").

42.     The rule is no different for third-party releases.  They are separate agreements

between non-debtors governed by state law.  Unlike a bankruptcy discharge, which "is an

---

[13] *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re LATAM Airlines Grp. SA*, 2022 WL 2206829, at *46 (Bankr. S.D.N.Y. June 18, 2022); *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).

involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so.*" *See In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original). *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *See Arrowmill*, 211 B.R. at 507.

43.    Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *See Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But the Bankruptcy Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. "There is no rule that specifies an 'opt out' mechanism or a

'deemed consent' mechanism" for third-party releases in chapter 11 plans.  *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  And no Bankruptcy Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

44.     Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual.  But because there is no applicable Bankruptcy Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law."  *See In re Spirit Airlines, Inc.*, 666 B.R. 689, 716 (Bankr. S.D.N.Y 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code).  Absent express authority in the Bankruptcy Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims.  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity."  *See In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct."  *See Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return).  Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

45.     Accordingly, state-law contract principles govern whether a third-party release is consensual.  *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D.

Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *See In re Tonawanda Coke Corp*., 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223).  And "any such consensual agreement would be governed by state law." *See id.*

46.     Even if federal law applied, however, it would not lead to a different result.  That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *See Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up).  *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

### iii.      Under State Law, Silence is Not Acceptance

47.      The Debtor bears the burden to prove that the Plan is confirmable.  *See In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012).  The Debtor has not met this burden because it has failed to establish that the third-party release is consensual under state law, nor has it contended that consent exists under state law.

48.      Here, the Plan provides for application of New Jersey law.  *See* Dkt. 175 at Art. I.B, page 18 of 50.  Under New Jersey law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[14]  *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) (emphasis added) (internal quotation marks omitted) ("[i]t is requisite that there be an *unqualified acceptance* to conclude the manifestation of assent").

49.      Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[15]  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon &*

---

[14] The Court may apply New Jersey law because no party has suggested that any other state's law applies.  *See, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.").  Nor has anyone suggested there would be a different outcome under the law of any other jurisdiction, so no choice of law is required.  *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014).  Thus, the statement of one bankruptcy court that there is "no answer" to the choice of law question, *In re LaVie Care Cntrs., LLC*, No. 24-55507, 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024), is not true.  Even if a choice of law had to be made, if such a choice is made difficult by the breadth of the third-party release that may be a reason not to approve the plan, but it is not an excuse to flout the court's obligation to make a choice of law if there is an actual conflict of laws.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985); *Cf. Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 669 (E.D. Va. 2022).

[15] New Jersey, like many states, follows the Restatement (Second) of Contracts § 69.  *See, e.g. Weichert Co. Realtors*, 608 A.2d at 436; *James v. Global Tel*Link Corp.*, 852 F.3d 262, 266 (3d. Cir. 2017).

*Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

50.     There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent."  *See Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer").  "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

51.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  *See id.*  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  *See id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

### iv.    Failing to Opt Out Does Not Provide the Required Affirmative Consent

52.    The Plan imposes a third-party release on all holders of claims who are deemed to accept the Plan and who do not return an opt-out form, and all holders of claims that are deemed to reject the Plan and who do not return an opt-out form.  In other words, the Debtor purports to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent.  But under black-letter law, silence is not acceptance of the offer to release non-debtors.  *See, e.g.*, *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

53.    A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement.  *See Norcia*, 845 F.3d at 1282.  The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage.  *See id*. The customer did not opt out.  *See id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *See id*. at 1282-83.

54.    The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  *See Norcia*, 845 F.3d at 1284 (quotation marks omitted); *accord See Urban Green Techs., LLC v. Sustainable Strategies*

*2050 LLC,* No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017).  The customer

did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that

would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration

agreement."  *See Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though

the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's

offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the

person to whom it is made or sent makes no reply, even though the offer states that silence will be

taken as consent, unless an exception to this general rule applies."  *See id*. at 1286 (quotation marks

and citation omitted).

55.    The Ninth Circuit held that none of the exceptions to this rule applied.  *See Norcia*,

845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response

to the offer, the parties did not have a prior course of dealing that might impose such a duty, and

the customer did not retain any benefits by failing to act given that the warranty applied whether

or not he opted out of the arbitration provision.  *See id*. at 1286.

56.    Here, too, Debtor's creditors have not signed an agreement to release the non-

debtor releasees nor acted in any other manner to suggest that their silence manifests an intention

to accept an offer to release the non-debtors.

### a.    Not voting and not opting out is not consent to release non-debtors

57.    Third-party releases cannot be imposed on those who do not vote and do not opt

out.  *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82;

*In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  442 B.R. 314, 355 (Bankr.

D. Del. 2011).  This applies to both those creditors who simply abstain from voting and those

creditors who are not entitled to vote on the Plan because they are deemed to accept or reject.

There is no basis to infer consent by those who do not vote and are taking no action with respect to the Plan.

58.    Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *See SunEdison*, 576 B.R. at 458–61.  Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981).  Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

59.    Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016).  Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *See SunEdison*, 576 B.R. at 461.  This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt-out that they must return to avoid being bound by the third-party release.

60.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent'

beyond the breaking point." *See Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *See Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *See Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *See id.*

61.     Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *See In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix*, 533 B.R. at 81–82.

### b.     Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release

62.     Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* Restatement (Second) of Contracts § 69 cmt. a (1981). Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors. The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors. *See* Restatement (Second) of

Contracts § 69 cmt. a.  Impaired creditors have a federal right under the Bankruptcy Code to vote

on a chapter 11 plan.  *See* 11 U.S.C. § 1126(a).  Merely exercising that right does not manifest

consent to release claims against non-debtors.

63.    Even more obviously, those who vote to reject the plan are not consenting to third-

party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to

the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.

As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan

should also be presumed to have rejected the proposed third-party releases that are set forth in the

plan.  *The additional 'opt out' requirement, in the context of this case, would have been little more*

*than a Court-endorsed trap for the careless or inattentive creditor.*"  *See* 533 B.R. 64, 79 (Bankr.

S.D.N.Y. 2015) (emphasis added).

> **c.    Smallhold's conclusion that voting plus a failure to opt out equals consent to a non-debtor release is incorrect**

64.    One bankruptcy court has found that, in at least some circumstances, a failure to

opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if

they do not vote.  *See Smallhold,* 665 B.R. at 723.  Notably, though, *Smallhold* did not allow a

mere vote in favor of the plan to constitute consent to a third-party release.  Although stating it

was applying "ordinary contract principles," *see id*. at 724, the *Smallhold* decision did not correctly

apply those principles to the question of when silence can constitute consent for those who vote

on the plan.

65.    As an initial matter, the *Smallhold* court correctly recognized that a failure to opt

out by those who do not vote does not constitute consent.  *See Smallhold*, 665 B.R. at 721-23.  The

*Smallhold* court elucidated the point with a hypothetical: a chapter 11 plan requiring that any

creditor that did not "check an 'opt out' box on a ballot . . . make a $100 contribution to the college

25

education fund for the children of the CEO of the debtor." *See id*. at 710.  As the court observed, "no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution." *See id*. None of the cases that allow imposing a non-debtor release based on a failure to opt out "provides any limiting principle that would distinguish the third-party release from the college education fund plan." *See id*.

66.     Contract law likewise does not support imputing consent to a third-party release based on a failure to opt-out by those who vote on the plan.  Nevertheless, the *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release.  *See Smallhold,* 665 B.R. at 717, 723-724.  But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release.  *See* Restatement (Second) of Contracts § 69 cmt. a (1981) (emphasis added).

67.     "The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *see* Restatement (Second) of Contracts § 69 cmt. a—in this case, the federal right to vote on a chapter 11 plan.  11 U.S.C. § 1126(a).  Nor does it "impose on him any duty to speak," *see* Restatement (Second) of Contracts § 69 cmt. a, such as by checking an opt out box.  Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the non-debtor release.  Just like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed to return a ballot with an "opt out" box, *see Smallhold*, 665

B.R. at 710, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box.[16]

68.     State law affords no basis to conclude that consent to release *third-party* claims (which are governed by *nonbankruptcy* law) can properly be inferred from a party's failure to check an opt-out box on a ballot expressing its views about the proposed treatment of its claims against the *debtor* (governed by *bankruptcy* law).   As a result, the "general proposition" that *Smallhold* recognized continues to apply: "creditors must *affirmatively express consent to the release* in order to be bound by it." *See id.* at 717 (emphasis added).

69.     Notably, the Ninth and Second Circuit cases cited by *Smallhold* do not support its conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent. *Smallhold,* 665 B.R. at 724 n.60 (citing *Berman v. Freedom Financial Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).  Those cases emphasize that notice to the offeree is a prerequisite to consent "*regardless of apparent manifestation of his consent.*"  *Meyer*, 868 F.3d at 74 (internal quotation marks omitted; emphasis added).  But while notice of a contractual term is necessary for consent, notice alone is not sufficient.[17]   *See, e.g., Meyer*, 868 F.3d at 74; *Norcia*, 845 F.3d at 1284; Restatement (Second) of Contracts § 69 cmt. a.   There must also be a manifestation of an intent to accept the offer. *See, e.g., Berman*, 30 F.4th at 85; *Norcia*, 845 F.3d at 1284;

---

[16] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases." *See In re Spirit Airlines, Inc.*, 666 B.R. at 719-720.  That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan.  Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *See id*. at 720. "When the circumstances are equally consistent with either of two facts, neither fact may be inferred."  *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016).  And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

[17] For this reason, cases that rely solely on notice to conclude that there is consent to a third-party release are likewise off base. *See, e.g., In re Spirit Airlines, Inc.*, 666 B.R. at 705  (collecting cases).

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  For the reasons discussed above, the failure

to opt out of the third-party release is not such a manifestation of consent.

### v.        Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

70.      Applicable state contract law cannot be disregarded on a procedural default theory,

applied by some courts, under which creditors who remain silent are held to have forfeited their

rights against non-debtors if they received notice of the non-debtor release but failed to object, just

as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[18]  *See,*

*e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6

(Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt*

*PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179,

218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24,

2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011).  These courts reasoned that so

long as the creditors received notice of a proposed non-debtor release and were informed of the

consequences if they did not opt out or object to that release, there is no unfairness or deprivation

of due process from binding them to the release.  *Cf. Smallhold*, 665 B.R. at 708 (describing this

reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party

release to be entered by default").

71.      A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In*

*re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).  The *Mallinckrodt* court stated

that "the notion that an individual or entity is in some instances deemed to consent to something

by their failure to act is one that is utilized throughout the judicial system." *See id.*  "When a party

to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise

---

[18] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 666 B.R. at 715, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond.

respond, or a judgment is automatically entered against them." *See id*. at 879.  The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *See id*.

72.     This is wrong.  First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling.  Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right.  *See United States v. Olano*, 507 U.S. 725, 731 (1993).  Forfeiture, unlike waiver, is not an intentional relinquishment of a known right.  *See id*. at 733.  *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on account of its default.").  Forfeiture principles thus do not show consent.

73.     Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan.  No one has submitted the released claims for adjudication by the bankruptcy court.  *See Olano*, 507 U.S. at 731.

74.     And under *Purdue*, imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan.  *See Purdue*, 603 U.S. at 215-227 & n.1; *see also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection.").  It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release."  *See Smallhold*, 665 B.R. at 719.

75.     The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of

creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *See Smallhold*, 665 B.R. at 708-09; *see also id*. at 708 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *See id*. at 717-18. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *See id*. at 709; *see also id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

76.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *See id*. at \*2; *see also id*. at \*13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

77.    "[After *Purdue*], that is no longer the case in the context of a third-party release." *See Smallhold*, 665 B.R. at 722.  A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."  *See id.*  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *See id.*  That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.  Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See id.* at 719-20.

78.    Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *See id.* at 709.  And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *See id.*  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[19]  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *See id.* at 720 (emphasis added).

79.    In sum, the failure to opt out does not constitute the affirmative consent necessary to reflect unqualified acceptance by the Holders of Claims and Interests to the third-party releases

---

[19] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

the Plan seeks to provide to the many so-called "Released Parties."[20]  As a result, the Debtor does

not meet its state-law burden of establishing that the members of the Classes in the Plan have

agreed to release their property rights and have that release memorialized in the Plan.  *See*

*Weichert*, 608 A.2d at 284.  Nothing in the Bankruptcy Code authorizes bankruptcy courts to

extinguish claims by inferring consent outside the bounds of state law.  It is especially egregious

to do so here to parties that are not entitled to vote on the Plan.  The Plan's third-party releases are

therefore non-consensual, and so are prohibited by *Purdue*.

## II.   THE PLAN IS NOT CONFIRMABLE BECAUSE IT PROPOSES AN EXCULPATION PROVISION THAT EXCEEDS THE LIMITATIONS OF THIRD CIRCUIT LAW

80.     The Plan is not confirmable for the separate and independent reason that it includes

an impermissible exculpation provision.  To the extent applicable law authorizes exculpation

beyond the provisions of Bankruptcy Code section 1125(e), the Plan's exculpation provision

contravenes Third Circuit precedent because it is not limited to estate fiduciaries.  *See In re PWS*

*Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

81.     The Plan's definition of Exculpated Party includes the Post-Effective Date Debtor.

*See* Dkt. 175 at Art. I.A 66, page 11 of 50.  But the Post-Effective Date Debtor is not an estate

fiduciary, because it will only come into existence after the Plan's Effective Date.  *See In re*

*Mallinckrodt PLC*, 639 B.R. 837, 883 (Bank. D. Del. 2022).  As the Plan's exculpation provision

shields the Post-Effective Date Debtor, it is overbroad and inconsistent with controlling case law.

*See id*.

---

[20] In addition, the over-expansive defined term "Related Parties" throws the proposed third-party release into the unknown—indeed, the unknowable—regarding the entities that will be receiving releases.  This Court cannot find that a creditor or equity interest holder intends to grant a "consensual" release to existing or past persons or entities that are not identified in the Plan, much less ones that do not yet exist.

82.     In addition, the Debtor seeks to exculpate the Exculpated Parties for **(i)** prepetition conduct such as "any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement and any Sale Transactions, the pursuit of Confirmation, the pursuit of consummation of a Sale Transaction," and **(ii)** post-Effective Date conduct such as "administration and implementation of the Plan, the distribution of property under the Plan or any other related agreement." *See* Dkt. 175 at Art. VII.C, page 38 of 50.

83.     However, exculpation is only available for services rendered between the Petition Date and the Effective Date. *See Mallinckrodt*, 639 B.R. at 883 (holding that exculpation "only extends to conduct that occurs between the Petition Date and the effective date," and ordering contrary language "must therefore be stricken"). As the Plan's exculpation provision would allow exculpation for conduct that occurred before the Petition Date and after the Effective Date, it exceeds the allowable scope of exculpation, and effectively imposes a non-consensual release of non-debtors by non-debtors in contravention of the Supreme Court's decision in *Purdue,* 144 S. Ct. at 2082-88. As such, the Plan cannot be confirmed unless the exculpation provision is revised to comply with applicable law.

84.     Further, through the Plan's exculpation provision, the "Exculpated Parties" are granted the protection and benefits provided pursuant to section 1125(e) of the Bankruptcy Code. *See* Dkt. 175 at Art. VII.C, page 38 of 50. However, section 1125(e) provides protection to a "person that solicits acceptance or rejection of a plan[.]" *See* 11 U.S.C. § 1125(e). Here, only the Debtor and certain of its officers, directors, and professionals will be soliciting acceptances or rejections under the Plan, so they are the only ones eligible for section 1125(e) protection. Such

protection should not be provided to the Post-Effective Date Debtor or the Creditors' Committee because they did not solicit acceptances or rejections of the Plan.[21]

85.     Additionally, the Exculpation Provision shields the Exculpated Parties in ways inconsistent with Third Circuit precedent, including *PWS*, because it seeks to "deem" the Exculpated Parties as having participated in good faith, which then swallows the preceding exception that limits exculpatory relief for "except for Claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence." *See id.* at Art. VII.C, page 38 of 50.

86.     In light of the foregoing, the Plan cannot be confirmed unless the exculpation provision is stricken or otherwise amended to be made consistent with applicable law.

### III.   The Rule 3020(e) Waiver Should be Denied.

87.     The Debtor's request for a waiver of the 14-day stay under Fed R. Bankr. P. 3020(e) stay is inappropriate and should be denied.[22]

88.     Rule 3020(e) provides an automatic 14-day stay on a confirmation order. *See* Fed. R. Bankr. P. 3020(e).

---

[21] In fact, the Debtor provides later in the Plan that only the Debtor and its agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys receives a good faith finding under section 1125(e): "[P]ursuant to section 1125(e) of the Bankruptcy Code, the Debtor and its agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals or the Debtor will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the Securities offered and sold under the Plan or any previous plan. *See* Dkt. 175 at Art. XI.K, page 49 of 50.

[22] "Subject to Article VIII.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, the Plan Administrator, and any and all present and former holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor each of respective successors and assigns of the foregoing persons and Entities" *See* Dkt. 175 at Art. XI.A, page 46 of 50.

89.    "[T]he goal of [Rule] 3020(e) is 'to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 11 of the Code before the plan is implemented and an appeal becomes moot.'"  *See In re Pac. Gas & Elec. Co.,* No. C-02-1550, 2002 WL 32071634, at *6 (N.D. Cal. Nov. 14, 2002).

90.    Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review.  *See In re Chemtura Corp.* No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010).  Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay.  *See id.*; *see also In re Adelphia Comm. Corp.*, 368 B.R. at 282 (denying request to waive automatic stay because "fairness to [objection creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review[.]")

91.    "An orderly bankruptcy process depends on a concomitantly efficient appeals process" and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay.  *See In re Syncora Guarantee Inc.*, 757 F.3d 511, 517 (6th Cir. 2014) (citations omitted).

92.    The Debtor has not established a basis to support waiving the 14-day stay and this request should be denied.

## IV.    Miscellaneous Objections to the Procedures Motion

93.    The proposed Solicitation Procedures authorize the Debtor to solicit votes on the Plan and also authorizes the Debtor to serve a Notice of Non-Voting Status and an Opt-Out Election Form on non-voting classes.  To the extent the Court agrees that the Opt-Out procedure

is invalid because failure to return the Opt-Out Election Form does not demonstrate consent, the

Court should deny the Procedures Motion.

94.    In the alternative, to the extent the Court conditionally approves the Disclosure

Statement, the U.S. Trustee also objects to the following provisions of the Debtor's proposed

Solicitation Procedures, the proposed Interim Approval and Procedures Order, and the exhibits

attached thereto:

- Paragraph 12 of the Motion should be included in the proposed Interim Approval and Procedures Order that provides a confirmation timeline. In addition, the dates proposed by the Debtor concerning the confirmation timeline should be revised as set forth below:

  The following combined adequacy of the Disclosure Statement and Plan Confirmation Timeline is hereby established (subject to modification as necessary) with respect to the solicitation of votes to accept the Plan, voting on the Plan, and confirming the Plan:

| Event | Date | Revised Date |
|---|---|---|
| Hearing on the Motion for Interim Approval | July 18, 2025 | **August 4, 2025** |
| General Bar Date not including Governmental Claims | July 21, 2025 | **July 21, 2025** |
| Initial Voting Record Date (to Be Included in Initial Solicitation Mailing) | July 14, 2025 | **August 1, 2025** |
| Supplemental Voting Record Date | July 22, 2025 | **August 11, 2025** |
| Initial Solicitation Mailing Deadline | Three (3) business days after entry of the Interim Approval and Procedures Order | **Two (2) business days after entry of the Interim Approval and Procedures Order** |
| Publication Deadline | | **Submission to the publication within two (2) business days after entry of the Interim Approval and Procedures** |
| Supplemental Solicitation Mailing Deadline | July 27, 2025 (or as soon as practicable thereafter) | **August 11, 2025** |
| File Plan Supplement | July 31, 2025 | **August 18, 2025 at 4:00 p.m. (ET)** |

| Objections to Confirmation/Final Approval of DS | August 7, 2025 at 4:00 p.m. (ET) | **September 2, 2025 at 4:00 p.m. (ET)** |
|---|---|---|
| Voting Deadline | August 7, 2025, at 4:00 p.m. (ET) | **September 2, 2025 at 4:00 p.m. (ET)** |
| Certification of Balloting | August 10, 2025, at 4:00 pm. (ET) | **September 4, 2025 at 4:00 p.m.** |
| Replies to Plan or Disclosure Statement Objections/Confirmation Brief | August 11, 2025 | **September 5, 2025 at 4:00 p.m.** |
| Hearing on Confirmation/Final Approval of DS | August 13, 2025 at 10:00 a.m. (ET) | **September 8, 2025 at 10:00 a.m. (ET)** |

- The proposed Solicitation Procedures should provide a provision that the Debtor is not required to resend a Solicitation Package or any other materials related to voting or confirmation of the Plan to any person or entity whose Solicitation Package or any other document related to voting or confirmation of the Plan is returned as undeliverable by the postal service, unless the Debtor is provided with accurate addresses for such person or entity prior to the Voting Record Date.

- The proposed Solicitation Procedures should provide a provision concerning publication with a newspaper and a time share/real estate publication (to the extent one exists) concerning the Confirmation Hearing Notice. The Debtor should be required to submit the Confirmation Hearing Notice to the newspaper for publication within two (2) business days of entry of the Interim Approval and Procedures Order.

- The proposed Solicitation Procedures should include a provision concerning the electronic online transmission of ballots through the online portal that provides that the encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot or Opt-Out Election Form submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective. Ballots and Opt-Out Election Forms submitted via the Balloting Portal or Opt-Out Portal, as applicable, shall deemed to contain an original signature.

- The proposed Solicitation Procedures should include a provision that provides the following concerning the submission of ballots and/or opt-out forms that have defects or irregularities: "To assist in the solicitation process, the Balloting Agent is authorized to contact parties that submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtor, Balloting Agent, nor any other person or entity shall be under any duty to notify any creditors of any defects or irregularities with respect to the deliveries of Ballots, and neither the Debtor, Balloting Agent, nor any other party shall be liable for failure to provide such notification. Delivery of such Ballots will not be

deemed to have been made until such irregularities have been cured or waived, unless the Court directs otherwise."

- Paragraph 27 of the proposed Interim Approval and Procedures Order should be revised as follows: "The Debtor is hereby authorized to make non-substantive, nonmaterial, or conforming changes to the Disclosure Statement, Plan, and any related documents without further order of the Court prior to mailing the Solicitation Packages, including any changes necessary to remedy typographical or grammatical errors; *provided however* that counsel to the Committee and the U.S. Trustee shall be provided notice of any non-typographical and grammatical changes."

## RESERVATION OF RIGHTS

95.     The U.S. Trustee reserves all rights to file a substantive objection on these issues, and others, in connection with final approval of the Disclosure Statement and confirmation of the Plan, but submits this Objection at this time on the basis that a disclosure statement for a patently unconfirmable plan should not be approved and the Plan should not be solicited.

96.     The U.S. Trustee leaves the Debtor to its burden of proof and reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection and reservation of rights, assert any objection, file any appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that this Court enter an order or orders: **(i)** denying conditional approval of the Disclosure Statement; **(ii)** denying the Procedures Motion; and **(iii)** granting such other and further relief as the Court deems just and equitable.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

By: */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney

*/s/ Lauren Bielskie*
Lauren Bielskie
Trial Attorney

Dated: July 28, 2025